**Richard ANDERSON, Jr., Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 90–196.**

District of Columbia Court of Appeals.

Argued Feb. 26, 1991.
Decided April 24, 1992.

---

Julia Leighton, Public Defender Service, with whom James Klein, Public Defender Service, was on the brief, for appellant.

Paul K. Carwile, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Elizabeth Trosman, and Andrew S. Levetown, Asst. U.S. Attys., were on the brief, for appellee.

Before STEADMAN and SCHWELB, Associate Judges, and MACK, Senior Judge.

SCHWELB, Associate Judge:

Anderson was convicted by a jury of distribution of cocaine, in violation of D.C.Code § 33–541(a) (1988). On appeal, he contends that the trial judge committed reversible error by refusing to require the police officer who was the principal witness for the prosecution to disclose the location of a concealed observation post from which the officer claimed to have seen Anderson make two sales of crack cocaine. Because Anderson failed to show that he "need[ed] the evidence to conduct his defense and that there are no adequate alternative means of getting at the same point," *United States v. Harley*, 221 U.S.App.D.C. 69, 71, 682 F.2d 1018, 1020 (1982), he did not overcome the government's qualified privi-

lege in maintaining the secrecy of surveillance locations. Accordingly, we affirm Anderson's conviction.

## I

## THE FACTS

The evidence in this case embraces a number of compelling vignettes regarding the way in which the "war on drugs" plays out in some of the neighborhoods of our capital. The Metropolitan Police Department (MPD) had received complaints of unlawful drug traffic in or near a small park and playground in the vicinity of 9th and Westminster Streets in northwest Washington. On April 22, 1988, several members of the MPD, including Officer Phillip Burton, decided to come to the park to check into these complaints and to conduct surveillance of the area to determine if any unlawful activity was afoot. They came, and there was.

Upon arriving in the area, the officers spoke with several individuals in the park. They did so, in Burton's words, because "I wanted to get a closer look at all the various people who were there, and a close look at their faces for future identification." Officer Kenneth Bryson testified that the purpose of this questioning was what could be called a "diversionary tactic." He said the officers wanted "to let them know we're in the area, not to arouse them or get them out of the area or anything like that, and to allow an observation officer to get somewhere in the area without detection." Although the police ostensibly intended to divert attention from the officer who was to man the observation post, that individual—Officer Burton—nevertheless participated in the questioning. One of the young men to whom he spoke was the appellant, Richard Anderson.[1]

Officer Burton then made his way to the observation post, which was apparently ten to twenty feet from the ground, and "pitch black" inside. There, using binoculars which enabled him to view the park as though it were seven to ten times closer than it actually was, he enjoyed what he said was an unobstructed view of the playground.

If one of the purposes of the police interrogations in the playground was the prophylactic one of deterring unlawful activity, it was not achieved for very long. Officer Burton testified that shortly after his arrival in the observation post, he saw Anderson—the very individual whom he had encountered under disputed circumstances minutes earlier—speaking to a man (later identified as Leon Thompson) who had approached Anderson on a blue moped. Anderson soon jogged away, but promptly returned, holding a small object in his right hand. He handed the object to Thompson, who gave Anderson an undisclosed amount of currency in return. Thompson put the object which he had just purchased into a cigarette pack and departed on his moped. Anderson remained on location, apparently counting his money.

Suspecting that he had witnessed a drug sale, Officer Burton notified an arrest team by radio of the events that had just transpired. Officers followed Thompson and eventually surrounded his moped several blocks west of the park. Resorting to a desperate stratagem common to those who are about to be apprehended in possession of suddenly unwanted contraband, Thompson threw a pack of Newport cigarettes under a car which was parked nearby. Officers recovered the cigarette pack and found that it contained a small quantity of what turned out to be crack cocaine. Thompson was arrested, and he eventually

---

**1.** The perceptions of this encounter by the principals are reminiscent of the illuminating Japanese film *Rasbomon,* which depicts a single happening from the different perspectives of its main protagonists. Officer Burton called it an "interview" and said he only asked Anderson his name and address. According to Officer Bryson, the police asked "the basic questions people are used to getting from the police, you know, what's your name, you know, do you live in the

block, certain questions like that." According to Anderson, on the other hand, officers came and "arrested" him, put him up against the wall, frisked him, put a leg between his legs, searched him, took his wallet from his back pocket, took $251 from the wallet, returned the money, asked for his name, address, and social security number, turned him around "face down," released him, and ordered him and his friends to "clear the park."

entered a plea of guilty to unlawful possession of cocaine.

Meanwhile, back at the park, Anderson was continuing to market his wares. According to Officer Burton, a second apparent customer arrived and had a brief conversation with Anderson. Anderson again sped away, but soon returned with several small objects, which he gave to the man in exchange for currency. The buyer left on foot, and Burton radioed his description to the arrest team; the officers were, however, unable to locate the man. Officer Burton then directed his colleagues to arrest Anderson, whom he described as a black male wearing a green jersey and stone-washed jeans.[2] Anderson was promptly taken into custody, and officers recovered $251 from his person.

Anderson testified on his own behalf and called several witnesses. The gravamen of the defense case was that after the officers had hassled Anderson as described above, see note 1, *supra,* he had gone to his home and spent time with a neighbor and some children, and had then returned to the park to meet a photographer. He claimed that he had not sold any drugs and that he was arrested almost immediately after returning to the scene. Anderson and a former girlfriend both testified that the $251 recovered from him belonged to her, and that she had given Anderson the money "for safekeeping" so that the couple could purchase a pair of earrings later that evening. The jurors evidently did not credit the defense version of events, and Anderson was found guilty as charged.

## II

## LEGAL DISCUSSION

### A. The Trial Judge's Rulings.

Anderson's sole claim on appeal is that his opportunity to confront and cross-examine Officer Burton, the principal witness against him, was unfairly and unlawfully impaired because the trial judge declined to

order disclosure of the location of the observation post,[3] or even to perform the balancing said to be required by our precedents. In assessing this contention, it is necessary first to explicate the context in which the issue arose.

On direct examination, Officer Burton testified that his observation post was 150 to 180 feet from Anderson's location, that it was a clear day, and that his view of the activity was both unobstructed and enhanced by powerful binoculars. On cross-examination, the following colloquy occurred:

> DEFENSE COUNSEL: Now your observation post was on the south side of the street, is that correct?
>
> PROSECUTOR: Objection.
>
> THE COURT: Sustained.
>
> DEFENSE COUNSEL: May we approach?
>
> THE COURT: No, ask your next question.
>
> DEFENSE COUNSEL: Well, you were in, you were in a building?
>
> PROSECUTOR: Objection, your Honor.
>
> THE COURT: Wait, let me hear.
>
> DEFENSE COUNSEL: You were in a building on Westminster?
>
> THE COURT: Is there an objection or not?
>
> PROSECUTOR: Yes, Your Honor.
>
> THE COURT: Objection is sustained.

With his initial inquiries blocked, presumably because no foundation had been laid, defense counsel switched to another topic. When he returned to the issue of the observation post, he asked Officer Burton to view a photograph of the arrest site and to mark on it the locations where the relevant events had transpired. After this inquiry had been completed, Anderson's attorney secured leave to approach the bench, and court and counsel discussed the issues relating to the observation post in some detail:

---

**2.** The prosecutor introduced a photograph of Anderson taken at the time of his arrest which conformed to that description.

**3.** Anderson had made a pretrial motion seeking such disclosure. The motion was denied by a different judge without prejudice to its renewal at trial.

DEFENSE COUNSEL: Based on what the officer has ... drawn on the photograph as well as the diagram, I represent to the court I have photographs that indicate that there are certain buildings from which the officer would not be able to observe the transaction or the passing of the money. And under those conditions, those circumstances, I ought to be able to—

THE COURT: Unless you can tell me there's no building from which he could have observed those transactions, [it] doesn't matter that there were some.

DEFENSE COUNSEL: No I can't tell you.

THE COURT: In my house there's a building [sic] from which you can't ever observe any transaction because it's not in an alley or anywhere near. But your telling me there's a building from which he could not observe doesn't tell me there are no buildings that he could have.

DEFENSE COUNSEL: I can't tell the court there are no buildings from which he could ever observe, but—

THE COURT: No, listen to what I'm saying. If you tell me there are no buildings from which he could have seen this, then, of course, you are entitled to find out where you think it was. But if you cannot say that, what's your point?

DEFENSE COUNSEL: I know I cannot say.

THE COURT: Then you're conceding [that] there must probably be a building in which he could have.

DEFENSE COUNSEL: I do concede that there was some building—

THE COURT: Then why are you entitled to know which one he was in?

DEFENSE COUNSEL: I think I am entitled to know [whether] in fact he could see what he said he saw.

THE COURT: You can ask him about obstruction; you can ask him about distance; you can and if you're lucky [the prosecutor] would be asleep on the wrong question. I'm not suggesting that he is asleep, I just mean he'll miss the question, but you're not entitled to any more than you would.

In every case you've got a situation where there's a building from which the officer could not have seen and a building from which he could. And if there was a building from which he could not see anything, everything he is saying is false, but that's not a theory [on] which you can discover an observation post.

DEFENSE COUNSEL: The way I understand the law I think that's precisely the theory.

THE COURT: No, sir. You show me a law in which it says that you can on cross examination.

DEFENSE COUNSEL: Very well.

THE COURT: ....

But he says he was elevated; there is only one place he could have been and that was in the building. And if the building has trees in front of it such that from the angle this person claims to have been able to observe the transaction he couldn't have seen it, then you're entitled to know that.

But you have to ask directly—weren't you in this building? And that's why something about his answer "I was elevated" tells you, that narrows down the places from which he could have seen such that you genuinely have a basis that he could not have seen what he could.

But if there are other places in which he could, the law doesn't let you, in balancing out your need to know and the need to preserve the integrity of the observation post or perhaps the safety of some of the citizens, that makes the balance. I wouldn't let you learn the location of the observation post which you can have plenty of room to explore.

DEFENSE COUNSEL: Very well, Your Honor.

THE COURT: And as you get closer come back.

In spite of the judge's invitation, Anderson's attorney asked no further questions regarding the location of the observation post.

## B. The Government's Qualified Privilege.

The common law has long recognized that the identities of individuals who provide information to the police or to prosecutors concerning criminal activities are protected from disclosure, and that the relevant privilege is one which the government may assert. *See, e.g., Vogel v. Gruaz,* 110 U.S. 311, 314–15, 4 S.Ct. 12, 13–14, 28 L.Ed. 158 (1884); *Developments in the Law–Privileged Communications,* 98 HARV. L.REV. 1450, 1596–1600 (1985). For many years, the courts viewed this privilege as an absolute barrier against disclosure. *Gruaz, supra,* 110 U.S. at 315, 4 S.Ct. at 14; *Privileged Communications,* 98 HARV. L.REV. at 1597. In *Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), however, the Supreme Court substantially redefined the government's privilege, holding that no fixed rule with respect to the disclosure of an informant's identity is appropriate, and that the public interest in protecting the free flow of information to the government must be balanced against an individual's right to prepare his defense. *Id.* at 62, 77 S.Ct. at 628.

There are obvious similarities (but some differences) [4] between the government's interest in protecting the identity of an informant and its interest in preventing the public disclosure of the precise location of a concealed observation post. In *Hicks v. United States,* 431 A.2d 18 (D.C.1981), relying on *Roviaro* and other precedents relating to informers, this court held that the government has a qualified privilege to withhold the location of a secret surveillance position. *Id.* at 21. We explained that the

[l]aw enforcement interests in surveillance positions are analogous to those concerning informants. If an observation location becomes known to the public at large, its value to law enforcement probably will be lost. The revelation, moreover, may jeopardize the lives of police officers and of cooperative occupants of the building.

*Id.* We left to the sound discretion of the trial court the determination whether in a particular case the privilege must yield to the accused's right to confront and cross-examine prosecution witnesses.[5]

■ The government concedes, and we agree, that evidentiary privileges, by definition, inhibit the production of potentially probative evidence. Recognition of such privileges is always, in some measure, "in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1974). Where, as here, the prosecution has invoked an evidentiary privilege in a criminal case, a ruling in the government's favor not only reduces the relevant information available to the trier of fact, but also restricts in some measure the accused's opportunity to confront and cross-examine the witnesses against him. Notwithstanding these countervailing concerns, which the government properly characterizes in its brief as "fundamental," certain narrowly defined evidentiary privileges have been found to be justifiable to protect specific and significant societal interests. As we have noted in our quotation from *Hicks, supra,* the government's interest in continuing to use an observation post and in the protection of the security of police officers and of cooperative citizens may justify some curtailment of the defendant's con-

---

**4.** For example, a police officer who declines to reveal the location of an observation post may readily be cross-examined on other matters. If the identity of an informant is withheld, however, the accused cannot examine him or her at all.

**5.** In *Hicks,* the defendant had sought disclosure of a concealed observation post for purposes of a pretrial motion to suppress evidence on Fourth Amendment grounds, and we recognized the existence of a qualified privilege in that context. Three years later, in *Thompson v.*

*United States,* 472 A.2d 899, 900 (D.C.1984), this court held that this qualified privilege also applies at the trial stage. We went on to explain in *Thompson* that since the defendant's personal interest in avoiding wrongful conviction (as distinguished from the more general and less individualized interest in deterring unreasonable seizures) is at stake at the trial stage, the result of the balancing process may be different. *Id.* at 900; *see also Commonwealth v. Lugo,* 406 Mass. 565, 571, 548 N.E.2d 1263, 1266 (1990).

frontation rights and related interests. No such curtailment will be countenanced, however, if the defendant can show that application of the privilege will jeopardize the fairness of the proceedings. *Hicks, supra,* 431 A.2d at 21.

■ Under our precedents, the determination whether disclosure of a concealed observation post shall be required proceeds in two stages. First, the defendant must make a threshold showing of need for the information; he must establish "that he needs the evidence to conduct his defense and that there are no alternative means of getting at the same point." *Thompson, supra* note 5, 472 A.2d at 900 (quoting *Harley, supra,* 221 U.S.App.D.C. at 71, 682 F.2d at 1020). This threshold showing is required upon the prosecution's invocation of the privilege, and before the court explores the specifics of the government's countervailing interest (*e.g.,* whether the observation post is still in use, whether cooperating civilians remain in jeopardy, and similar considerations). *See State v. Williams,* 239 N.J.Super. 620, 626, 571 A.2d 1358, 1362 (App.Div.1990). The defendant's burden in making his initial showing of need is therefore significantly more modest than his second-stage burden of establishing that, in spite of the possible peril to officers and civilians and the potential curtailment of a legitimate means of law enforcement arising in the particular case, disclosure should nevertheless be required.

■ Relying on *Thompson* and on our later decision in *Jenkins v. United States,* 541 A.2d 1269 (D.C.1988), Anderson asserted at trial and maintains on appeal that the threshold showing of need can be made simply by showing that there was some "vantage point in the relevant area that would not permit a clear view of [his] activities." *Thompson,* 472 A.2d at 901; *Jenkins,* 541 A.2d at 1272 (quoting *Thompson*). There is language in each of these opinions which, if extracted from its context, might be viewed at first blush as susceptible of that construction. An examination of the issues that were before the court in these cases, however, reveals that neither *Thompson* nor *Jenkins* held (or could have held) that such a showing, standing alone, is sufficient to demonstrate need.[6]

In fact, the construction of *Thompson* and *Jenkins* urged upon us by Anderson leads to unreasonable consequences. A tree on the north side of the street may impair an observing officer's view of the relevant activity from an observation post located on that side, especially if it is between the observation post and the site of the alleged wrongdoing. The same tree would be completely irrelevant to the officer's capacity to observe, on the other hand, if the observation post were on the south side, where there are no trees. Moreover, it is difficult to imagine an area in which there is *no* location from which the officer's view would be obstructed. Accordingly, if we were to adopt

---

**6.** In *Thompson,* this court, in affirming the trial judge's refusal to order disclosure, noted that "defense counsel offered no showing that there was any vantage point in the relevant area that would not permit a clear view of appellant's activities." 472 A.2d at 901. This sentence means that without such a showing, a defendant may not prevail. The converse, however, does not necessarily follow. We had no occasion in *Thompson* to decide whether proof of the existence of such an obstructed vantage point would be sufficient, without more, to establish need, for that issue was not presented.

In *Jenkins,* we again upheld a trial judge's refusal to order disclosure, this time despite a somewhat more sophisticated attempt by the defendant to demonstrate need. After noting the existence of the concealed observation post privilege, we stated that

[i]n order to overcome this qualified privilege, the defense must show there was some 'vantage point in the relevant area that would not permit a clear view of appellant's activities.' *Thompson,* 472 A.2d at 901. While Jenkins produced evidence of light posts, trees, and cars in the area, he made no positive showing that these could have precluded observation of his activities.

541 A.2d at 1272.

As in *Thompson,* this court decided in *Jenkins* that need cannot be established without proof that there are some impaired vantage points. We could not and did not resolve a question which was not presented, namely whether a showing that some obstructed locations existed would be sufficient, and whether this would be so even if the officer were to testify that he was not located at any of them.

Anderson's theory, we would effectively emasculate the requirement that the defendant make a threshold showing of need.

We therefore hold that the defendant is obliged to show not only that there are locations in the area from which the view is impaired or obstructed, but also that there is some reason to believe that the officer was making his observations from such a location. Without some reason so to believe, the existence of obstructed locations is logically irrelevant.

■ The defendant must, of course, be accorded a reasonable opportunity to explore the officer's ability to observe, and he is entitled to some leeway on cross-examination. If counsel is aware of actually or arguably obstructed locations, for example, he may inquire of the officer, indirectly or even directly, whether the observation post was located in any of them. If the officer declines to provide an informative response, then the defendant's showing of need is significantly enhanced, and the judge will ordinarily have to proceed to the balancing stage. If, on the other hand, the officer unambiguously testifies that he was not in any of the impaired locations, and if his testimony to that effect is credited by the court,[7] then it will ordinarily be difficult if not impossible, absent other indicia of unreliability, for the accused to sustain his threshold burden, for there will be no reason for the court to believe that the officer's view was obstructed.

### C. The Application of the Privilege to the Facts.

■ In the present case, as we have seen, Anderson's attorney proffered to the court that there were some locations in the area of the alleged offense from which the officer's view of what occurred would have been obstructed. For the reasons stated above, however, such a proffer is insufficient, and counsel failed to avail himself of the judge's invitation to interrogate Officer Burton further in order to substantiate his professed need.

Anderson contends that any further inquiry on his part would have been futile, because the judge had told him that he must surmount what he views as an insurmountable (and unjustifiable) burden. Although there was initially some confusion as to the questions defense counsel would be permitted to pose to Officer Burton and as to the showing which he would be required to make, we are satisfied that the trial judge's ultimate disposition was a reasonable one.[8]

The trial judge initially sustained prosecution objections to defense counsel's inquiries as to whether Officer Burton was on the south side of the street and as to

---

**7.** There is nothing intrinsically unacceptable about permitting the judge's assessment of the officer's credibility to be a significant or even decisive factor in the determination whether the location of the observation post is to be disclosed. "Nothing in the Due Process Clause of the Fourteenth Amendment requires a state court judge in every ... hearing [on a motion to require disclosure of an informant's identity] to assume [that] the arresting officers are committing perjury." *McCray v. Illinois*, 386 U.S. 300, 313, 87 S.Ct. 1056, 1063, 18 L.Ed.2d 62 (1967). The majority in *McCray* firmly rejected the contention of Justice Douglas and three other justices in dissent that "[t]here is no way to determine the reliability of Old Reliable, the informer, unless he is produced at trial and cross-examined." *Id.* at 316, 87 S.Ct. at 1065.

The defendant's showing of need is substantially strengthened, on the other hand, if "the evidence creates a substantial doubt about the credibility of the observer." *Hicks, supra,* 431 A.2d at 22–23 & n. 4. In *Commonwealth v.*

*Lugo, supra* note 5, 406 Mass. at 574, 548 N.E.2d at 1268, the court held that inconsistencies in the officer's testimony as to the location of the observation post, together with other discrepancies in his account and the lack of any corroboration of his testimony, constituted a "strong preliminary showing that [Lugo] might have need of the privileged information."

**8.** As we stated in *Hicks, supra,* 431 A.2d at 22 n. 2,

one way for the court to protect the government's privilege, while assuring itself that the police observer did—or did not—have an unobstructed view, would be to conduct an *in camera* proceeding at which the government informs the court of the secret location.

Courts in other jurisdictions frequently employ this general approach to resolve questions of this kind, *see, e.g., Williams, supra,* 239 N.J.Super. at 622, 571 A.2d at 1359–60; *Hines v. Superior Court,* 203 Cal.App.3d 1231, 1235, 251 Cal. Rptr. 28, 30 (1988), and we again invite our trial court to consider its use in appropriate cases.

whether he was in a building. See pages 493, *supra.* Although the judge did not explain the reasons for sustaining these objections [9] and, at that time, declined counsel's request to approach the bench, it is readily apparent from her subsequent handling of the issue that these initial rulings were based on counsel's failure to lay a foundation for the questions which he was posing. Once the necessary foundation had been laid by the officer's marking of relevant locations and the subsequent defense proffer, the judge explicitly invited Anderson's attorney to ask far more probing and specific questions about Officer Burton's location.

■ More troubling is the judge's remark that "[u]nless you can tell me there's no building from which he could have observed those transactions, [it] doesn't matter that there were some." See page 494, *supra.* Indeed, the judge repeated the same general theme on several occasions. If the judge's words are taken literally, the accused would be obliged to make a simultaneously *impossible* and *useless* threshold showing. It is difficult to conceive a scenario presenting *no* relevant location in any given area from which the officer would have an unobstructed view.[10] Moreover, if all of the potential locations were in fact fatally obstructed, it would make little difference whether the officer was in one such defective location or another.[11] It may be that the judge misspoke and intended to stress her basic point, with which we agree, that a showing that some possible locations are obstructed is insufficient unless there is some reason to believe that the officer was in one of them. However that may be, we disagree with the notion that Anderson was required to establish that every location in the area was obstructed in order to make his preliminary demonstration of need.

We are persuaded, however, that the later dialogue with defense counsel effectively dissipated any problem which the apparently misphrased standard may have generated. The judge's invitations for further defense exploration were both expansive and explicit. After the judge had explained to Anderson's attorney that "you can ask him about obstruction; you can ask him about distance," and after she had invited him to make logical deductions from the officer's disclosure that his location was an elevated one, the judge further narrowed the issue:

> [i]f the building has trees in front of it such that from the angle this person claims to have been able to observe the transaction he couldn't have seen it, then you're entitled to know that.
>
> *But you have to ask directly—weren't you in this building?*

(Emphasis added). In other words, the judge forthrightly invited counsel to make the very kinds of inquiries which we have held that he was entitled to make. Finally, the judge completed her explanation by telling counsel that he had "plenty of room to explore," and suggested that "as you get closer come back." Counsel never did so. He thus rested after making a showing of need which was based on an apparent misreading of *Thompson* and *Jenkins,* and which we therefore view as fatally deficient.

■ Moreover, this is not a case in which Officer Burton's testimony was so uncorroborated, flawed, or contradictory that the judge was obliged to disbelieve it. On the contrary, there is considerable circumstantial evidence that the officer had a sufficient opportunity to observe what he said he saw. He testified unequivocally that his view was unobstructed. He recognized Anderson as an individual whom he had previously interrogated in the park; this

---

**9.** Rulings such as "sustained" or "overruled" have the enviable virtue of brevity and are generally perfectly acceptable means of disposing of objections.

**10.** While it is perhaps conceivable that every elevated location has a wall or tree in front of it, the probabilities are to the contrary.

**11.** It is, of course, possible that the view from one location might be more severely obstructed than the view from another.

was confirmed by Anderson. He described Anderson's appearance in the lookout to the arrest team; Anderson's arrest photograph conforms to that description. Officer Burton also testified that he observed Thompson place suspected contraband in a packet of cigarettes; that packet, with cocaine inside, was recovered from beneath an automobile after Thompson had thrown it there.

Although Burton was the only witness who observed the alleged cocaine sale by Anderson, the circumstances provide significant corroboration of his observations. If his view had in fact been obstructed, it is improbable that he could have provided information which was so readily verified.

## IV

## CONCLUSION

For the foregoing reasons, we conclude that Anderson failed to make or proffer the required showing of need and that he was not precluded by the judge from making further reasonable inquiries. Accordingly, his conviction is hereby

*Affirmed.*

MACK, Senior Judge, dissenting:

Our case law states that an accused, in seeking to overcome the government's privilege of protecting a surveillance site, must demonstrate that (1) he needs evidence of the location to conduct his defense and (2) that there is "no adequate alternative means of getting at the same point." *Thompson v. United States,* 472 A.2d 899, 900 (D.C.1984). Need can be demonstrated if an accused can show "some" vantage point in the relevant area that does not permit a clear view. *Jenkins v. United States,* 541 A.2d 1269, 1272 (D.C.1988). This was the position taken by appellant's counsel at trial. Yet his efforts to have the court balance his need for evidence against that of the government's need for secrecy were thwarted by the trial court's emphatic

statement, repeated in theory, "unless you can tell me there's no building from which he could have observed those transactions, [it] doesn't matter that there were some."

In denying appellant access to evidence which he claims was necessary to his defense, the trial court has required him to meet a threshold test which is impossible for anyone to meet. Today, in this court, the majority (sealing the fallibility of its own reasoning) candidly states, "If the [trial] judge's words are taken literally, the accused would be obliged to make a simultaneously impossible and useless threshold showing." Yet, on the theory that the trial court "misspoke" and that appellant's trial counsel "misread" the case law of our appellate decisions, the majority affirms appellant's conviction, announcing for the first time yet another possibly insurmountable (and confusingly inexact) barrier for a defendant to meet in seeking to ascertain the location of a secret observation post of a witness against him.[1] The majority reasons that the trial court's invitation to counsel to "come back" (on the court's theory) somehow left the matter open. I cannot accept the majority's assessment of the trial court's ruling any more than I can accept its apparent relegation of this error to the status of what, for example, would be the laying of a proper foundation for the routine introduction of seemingly irrelevant evidence. The evidence sought here was constitutionally relevant.

In a broad sense, this case is not about buildings and obstructions; it is about a citizen's right to confront a witness against him—a hallowed right grounded in the Sixth Amendment to the Constitution. In balancing that right of confrontation against the "qualified" privilege of the government to withhold information at trial, the Supreme Court has made it clear that, based on the requirements of fundamental fairness, if the information is "relevant and helpful to the defense of the accused or is essential to a fair determina-

---

1. The majority states, "we therefore hold that the defendant is obliged to show not only that there are locations from which the view is impaired or obstructed, *but also that there is some* *reason to believe that the officer was making his observation from such a location."* (Emphasis added) (Majority op. at 497).

tion of a cause, the privilege must give way." *Roviaro v. United States*, 353 U.S. 53, 60–61, 77 S.Ct. 623, 627–628, 1 L.Ed.2d 639 (1957). *See also Jenkins v. United States, supra*, 541 A.2d at 1272; *Thompson v. United States, supra*, 472 A.2d at 900; *Hicks v. United States*, 431 A.2d 18, 21, (D.C.1981). Indeed, the government in this case, in conceding that the employment of evidentiary privileges is always to some extent "in derogation of the search for truth" (citing *United States v. Nixon*, 418 U.S. 683, 710, 94 S.Ct. 3090, 3108, 41 L.Ed.2d 1039 (1973)), also concedes that an accused can "pierce the veil" of the government's privilege by showing that its invocation would result *in an unfair trial based upon the specific circumstances of the case. See Hicks, supra*, 431 A.2d at 21.

Here there is no question that the location of the observation post manned by Officer Burton would have been relevant to the defense of appellant. It was the "pitch black" locus from which the officer made his incriminating observations. Moreover, the location was more than relevant to the defense. It may have been essential to a fair trial. Burton was the only officer—the only witness—to identify appellant as the seller of the drugs recovered outside the viewing area by other officers. In the specific circumstances of this case, it was Burton's testimony alone, that criminally implicated appellant.

In defense, appellant testified that his residence was near the park. Although he was present in the park when Officer Bur-ton entered therein (on the officer's way to the observation post)[2] appellant left the site, returning only minutes before he was arrested. He argued that his arrest was the result of mistaken identity. He presented alibi witnesses who testified that he was not in the park at the time of the narcotics sales. To substantiate the mistaken identity theory, however, evidence casting doubt on the reliability of the officer's testimony was necessary. *See Hicks, supra*, 431 A.2d at 22 n. 4. This was what appellant's counsel sought to emphasize during cross-examination—proffering photographs "that indicate there are buildings from which the officer would not be able to observe the transaction or the passing of money." Yet his probe even as to generalized location was effectively foreclosed by the government's vigorous objections which the trial court sustained.[3]

Once appellant met the requirements of showing need, the court was required to balance the "defendant's personal interest in avoiding wrongful conviction" against the government's interest in protecting its surveillance site. *Thompson, supra*, 472 A.2d at 900–01. Having erroneously concluded that appellant's showing of need was inadequate, the trial court never engaged in this balancing and therefore never reached a determination on the disclosure issue. Keeping in mind that an important substantive right of appellant is involved[4] and that a balancing of the two societal interests mandates adherence to the "fun-

---

**2.** There is an implied suggestion of more than mistaken identity. In the vignette described by the majority, despite the "diversionary tactic" employed initially by the officers to permit Burton to reach his hiding place unobserved, Burton actively participated in such tactic. There were conflicting accounts of the resulting encounter with appellant. (See Majority op. at 492 note 1.) This was a situation where the jury was required to believe either Officer Burton or Mr. Anderson.

**3.** During cross-examination, appellant's counsel, through use of diagrams and photographs of the area, established the exact location of the alleged sales. Counsel then attempted to challenge the ability of the officer to observe by inquiring whether the officer was on the south side of the street. The government objected to the question and the court sustained the objection. Counsel then inquired whether the officer was in a building. The government again objected and objection was sustained. In a bench conference, counsel requested permission from the court to inquire into the officer's location, proffering that he had photographs indicating the existence of buildings in the area from which the officer would not have been able to observe appellant. The trial court refused to grant the request making what was a misstatement of the burden of proof.

**4.** *Thompson, supra*, 472 A.2d at 900. We note the suggestion in *Thompson* that the "balancing process may be different at the trial stage from what it would have been at the pretrial stage. *Id.* (citing *Hicks, supra*, 431 A.2d at 22).

damental requirements of fairness,"[5] I would remand to the trial court for a hearing so that the trial judge can engage in the appropriate balancing test and, if the court concludes disclosure is required, for a new trial.

---

**5.** *Id.* (quoting *Roviaro, supra,* 353 U.S. at 60, 77 S.Ct. at 628).