Robert S. CARTER, a/k/a Robert
S. Jones, Appellant,

v.

UNITED STATES, Appellee.

No. 90–CF–318.

District of Columbia Court of Appeals.

Argued May 8, 1992.
Decided Sept. 18, 1992.

Richard Seligman, appointed by this court, for appellant.

William M. Sullivan, Jr., Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher, Thomas J. Tourish, Jr., and Joyce Jiyoung Bang, Asst. U.S. Attys., were on the brief, for appellee.

Before ROGERS, Chief Judge, and TERRY and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

The government has a qualified privilege not to reveal the exact location of a concealed surveillance post used by police officers in their continuing battle against drug traffic. In this case, as in the past, the government refused to reveal the location of one such observation post. Appellant challenges the trial court's refusal to compel its disclosure. Since we find no error in the trial court's decision, and since we see no merit in appellant's other arguments, we affirm his conviction of distribution of heroin.

I

One afternoon in August 1989, Officer Ralph Nitz of the Metropolitan Police was assigned to investigate illegal narcotics activity in and around the 1900 block of Ninth Street, N.W. With the aid of binoculars, Officer Nitz was watching for suspected drug sales from a concealed observation post, from which he could see the 1800 and 1900 blocks of Ninth Street as well as the 800 and 900 blocks of T Street, N.W. Nitz testified that the observation post was on the second floor of a building, that he was looking down at the street through a window made of untinted glass, and that his view was not blocked by trees.

From his observation post, Officer Nitz caught sight of appellant Carter on the sidewalk on the east side of Ninth Street, just south of the building at number 1909. Nitz also saw another man, Michael Day, seated on a banister in front of 1909 Ninth Street. The officer watched as a third man, Carlos Dorsey, approached Carter and spoke with him briefly. Carter and Dorsey then walked over to where Day was sitting. After Carter said something to Day, Day gave him a small object, which he in turn handed to Dorsey. Officer Nitz then saw Dorsey give appellant a sum of money and walk away.

Nitz radioed descriptions of Carter, Day, and Dorsey to other police officers in the area who were working as an arrest team. Almost immediately the arrest team stopped and arrested Carter and Day within sight of Officer Nitz, who promptly identified the two men (apparently also by radio) as the ones he had seen earlier. The arrest team then stopped Dorsey, recovered from his person a small packet of white powder,[1] and placed him under arrest. Officer Nitz later identified Dorsey as the man he had previously seen approach Carter and then give him money in exchange for an object.[2]

Carter and Day were jointly charged in one count of a six-count indictment with distribution of heroin.[3] That count was severed from the other five, and after a jury trial on that count alone, both defendants were found guilty as charged. From the judgment of conviction, Carter brings this appeal.[4]

---

1. Subsequent chemical analysis of the powder showed that it contained heroin.

2. In addition to Officer Nitz, the arresting officers, and the chemist, the government presented an expert witness, Detective Charles Di Domenico, who testified about the practices of drug sellers who work in two-person teams.

3. D.C.Code § 33–541(a)(1) (1989). In the other five counts, Day, Dorsey, and others were charged individually with other drug offenses.

4. Day also noted an appeal from his conviction, which was separately briefed. His conviction was affirmed in an unpublished memorandum opinion and judgment. *Day v. United States*, No. 90–441 (D.C. March 11, 1991).

## II

Carter makes three arguments on appeal. First, he contends that the trial court erred in failing to hold an *in camera* hearing and ultimately to force the government to reveal the location of the observation post from which Officer Nitz viewed the transaction at issue. Carter's argument about the observation post is defeated by this court's recent decision in *Anderson v. United States*, 607 A.2d 490 (D.C.1992), which outlines the showing of need required to defeat the government's privilege not to reveal the post's location. We hold that Carter's showing at trial did not meet the requirements of *Anderson*.

Carter also claims that the prosecutor's cross-examination of Carlos Dorsey, the single defense witness, was improper, and that as a result his conviction should be reversed. Assuming (without deciding) that some of the prosecutor's questioning of Mr. Dorsey was improper, we do not find it so prejudicial as to require reversal. Finally, Carter asserts that the trial court committed plain error by allowing Officer Nitz to state his opinion that he had witnessed a drug transaction from the observation post. This court has held, however, that a fact witness may express an opinion based on his or her personal observations if that opinion will be helpful to the jury; consequently, we find no plain error.

### A. *Location of the Observation Post*

■ In the District of Columbia it is well established that "the government has a qualified privilege to withhold the exact location of an observation post." *Thompson v. United States*, 472 A.2d 899, 900 (D.C.1984); *see Jenkins v. United States*, 541 A.2d 1269, 1272 (D.C.1988); *Hicks v. United States*, 431 A.2d 18, 19 (D.C.1981); *United States v. Harley*, 221 U.S.App.D.C. 69, 71, 682 F.2d 1018, 1020 (1982). That privilege, however, is not absolute. A defendant can force the government to divulge the exact location of an observation post upon a sufficient showing of need. Our recent *Anderson* opinion described that showing:

Under our precedents, the determination whether disclosure of a concealed observation post shall be required proceeds in two stages. First, the defendant must make a threshold showing of need for the information; he must establish "that he needs the evidence to conduct his defense and that there are no alternative means of getting at the same point." ... The defendant's burden in making his initial showing of need is ... significantly more modest than his second-stage burden of establishing that, in spite of the possible peril to officers and civilians and the potential curtailment of a legitimate means of law enforcement arising in the particular case, disclosure should nevertheless be required.

*Anderson v. United States, supra,* 607 A.2d at 496 (citations omitted).

■ We rejected in *Anderson* the notion that a defendant could make the requisite showing of need "simply by showing that there was some 'vantage point in the relevant area that would not permit a clear view of [his] activities.'" *Id.* (citations omitted). The standard we set forth in *Anderson* calls for more:

We ... hold that the defendant is obliged to show not only that there are locations in the area from which the view is impaired or obstructed, but also that there is some reason to believe that the officer was making his observations from such a location. Without some reason so to believe, the existence of obstructed locations is logically irrelevant.

*Id.* at 497. Thus *Anderson* requires a defendant seeking to compel disclosure of the location of a surveillance post to show not only that some possible observation posts were obstructed, but also that there is reason to believe that the observing officer was actually situated in such a place.

Appellant Carter did make an effort to show that Officer Nitz had conducted his surveillance from an observation post from which the view was obstructed. Defense counsel sent an investigator to the scene at least twice. The investigator and counsel came up with a theory of where the observation post was located, and counsel argued that the view from that spot was

obstructed. Despite this detective work, the trial court did not accept counsel's hypothesis that Officer Nitz had seen the drug transaction from an impaired vantage point; on the contrary, the court characterized counsel's proffer as to the location of the post as "very speculative." The court credited instead Officer Nitz's consistent and unambiguous testimony that he could see the transaction clearly and without obstruction.

Carter asserts that requiring a defendant to produce evidence to discredit the officer's assertion about his observations creates a heavy burden. But that heavy burden is exactly what we intended in *Anderson:*

> If ... the officer unambiguously testifies that he was not in any of the impaired locations, and if his testimony to that effect is credited by the court, then it will ordinarily be difficult if not impossible, absent other indicia of unreliability, for the accused to sustain his threshold burden, for there will be no reason for the court to believe that the officer's view was obstructed.

607 A.2d at 497 (footnote omitted). Thus *Anderson* anticipated the situation presented in the case at bar. Officer Nitz testified that he could see the drug transaction clearly, and Carter did not present any evidence which cast doubt on that testimony. Since the defense failed to demonstrate that the location from which Officer Nitz watched Carter's dealings with Messrs. Day and Dorsey had an obstructed view, we hold that Carter's showing did not meet the *Anderson* standard.[5]

■ Carter also argues that the trial court erred by not conducting an *in camera* hearing about the location of the surveillance post.[6] We have recognized that the trial court has discretion to conduct an *in camera* hearing in the course of deciding whether to require disclosure. *See Thompson v. United States, supra,* 472 A.2d at 901 (trial court was "well within its discretion in refusing to entertain" defense counsel's request for an *in camera* hearing); *Hicks v. United States, supra,* 431 A.2d at 22 n. 2. The Supreme Court, in another context, has said that a trial court "should require a showing of a factual basis adequate to support a good faith belief by a reasonable person ... that *in camera* review of the materials may reveal evidence to establish the claim...." *United States v. Zolin,* 491 U.S. 554, 572, 109 S.Ct. 2619, 2631, 105 L.Ed.2d 469 (1989) (citation and internal quotation marks omitted). We apply this principle here and hold that the trial court "should require a showing of a factual basis adequate to support" the request for an *in camera* hearing. The trial court in this case credited Officer Nitz's testimony that his view of the relevant transaction from the observation post was not obstructed, and the defense did not rebut or contradict that testimony with any other evidence. We therefore conclude that the trial court did not abuse its discretion in refusing to hold an *in camera* hearing.

■ We note nevertheless that, while not compelled, an *in camera* inquiry may be very useful in reconciling the defendant's need for disclosure with the government's interest in maintaining the confidentiality of its observation posts. *In camera* review averts the dangers of disclosure which we recognized in *Anderson,* namely, that such disclosure would preclude further use of the observation post by the police and might subject the owner of the build-

---

5. We rejected essentially the same argument in the appeal of the co-defendant Day, *supra* note 4, holding that Mr. Day had similarly failed to establish the requisite need to overcome the government's qualified privilege. Although the *Day* opinion, being unpublished, is of no precedential value, *see* D.C.Ct.App.R. 28(h), the claim of error appears to have become no more meritorious in the year and a half since *Day* was decided.

6. The parties dispute whether Carter ever actually requested an *in camera* hearing. Counsel for Mr. Day at one point stated, "Perhaps the Court can ex-parte with just the government, see if that is the spot." While that request was a bit awkwardly framed, it essentially asked the court to review the location of the observation post *in camera* in order to determine whether the defense was entitled to know where it was. We are satisfied that the request was sufficient to preserve the point for appellate review.

ing where the post is located to harassment or retaliation. *Anderson, supra,* 607 A.2d at 495–496. Information disclosed *in camera* can often aid the court in its assessment of the defendant's claim of need for disclosure. We think *in camera* review is a useful and relatively risk-free tool which should be used liberally by courts in situations such as the one presented here. Our refusal to require *in camera* review in the instant case reflects a respect for the discretion of trial courts, not a disrespect for the utility of such review.

### B. *The Prosecutor's Cross–Examination of Mr. Dorsey*

■ Carlos Dorsey was the only witness for the defense. He admitted that he had purchased heroin on the day of his arrest— in fact, he had pleaded guilty to the second count of the indictment, which charged him with possession of heroin—but he said that the person who had sold it to him was not appellant Carter, and that he had never seen either Carter or Day before he was arrested. On cross-examination the prosecutor asked him:

Q. You know the consequences of jeopardizing a supply of heroin, don't you, if you testify against someone? ... You know the practice on the street, don't you?

A. The practice on the street?

Q. In terms of knowing where to get your drugs, isn't that true?

A. Yes.

Q. And you usually go to [a] regular person, don't you?

A. Generally.

Q. That's right. In your neighborhood?

A. Right.

Q. And you know that ... there's a lot of street talk on the street between dealers; isn't that true?

A. True.

Q. And you know that if you were to testify against someone, and the word got around, that maybe it would jeopardize your future supply; isn't that true?

A. Not—no, not really.

Q. Or that maybe the word would get around to other people, or maybe something would happen—

At this point Day's counsel objected. The court overruled the objection, but suggested that the prosecutor rephrase the question "to make it a little more precise.... What you need to do is take that last question and put it directly to the witness, ask him directly what you mean." The questioning then resumed:

Q. I'm just saying that if you were in court or in a situation where you had to identify somebody and say, you know, they're the ones, they're the ones who are guilty. That you would be afraid in some way that that might jeopardize your supply of heroin, or that you might face other consequences in the street, that you know that people talk in the streets; isn't that true?

A. In some cases it's like that.

Carter now claims that this line of questioning "clearly implied that the witness was testifying because he was threatened by the defendant or that the defendant suborned perjury." Since there was no factual predicate for the questions, he contends, the trial court erred in allowing them to be asked. He also argues that these questions impermissibly placed evidence of other crimes before the jury, contrary to the teaching of *Drew v. United States,* 118 U.S.App.D.C. 11, 15–16, 331 F.2d 85, 89–90 (1964).

Carter places great reliance on *Ali v. United States,* 520 A.2d 306 (D.C.1987), which at first glance appears to be quite similar to this case. In *Ali* the prosecutor questioned a defense witness about a conversation in the hallway of the courthouse in which the witness "was supposedly overheard saying that [the defendant] had asked him to testify falsely...." *Id.* at 315. The witness denied saying this, and there was no other evidence that such a conversation ever took place. Later, during his rebuttal testimony, a detective said that he had seen the defendant in the courthouse cafeteria "walking up to his witnesses and putting his face right up and say[ing], 'Now remember this.'" The de-

tective added, however, "That's the only thing I overheard." *Id.* We held that the detective's observations "constituted a slim reed upon which to hang the inferences of [the defendant's] misconduct which the prosecutor placed before the jury" in his closing argument, and that "asking these apparently baseless questions relating to the alleged hallway conversation constituted prosecutorial misconduct." *Id.*

This case is different from *Ali* in one critical respect. In *Ali* the prosecutor, through questioning and argument, insinuated without foundation that the defendant, by intimidating the witness, "was striving to undermine the very fairness and integrity of the judicial process...." *Id.* at 316; *see also Menzies v. Procunier*, 743 F.2d 281, 289 (5th Cir.1984) (prosecutor improperly suggested, through questioning and closing argument, that defendant was involved in attempt by other persons to frighten witness into dropping charges). In the case at bar, however, the prosecutor's questions did not imply in any way that either defendant had tried to intimidate Dorsey into testifying falsely. The questions referred only to "other people" "on the street" without identifying anyone in particular. To the extent that the prosecutor may have pointed an accusing finger, it was pointed at Dorsey's usual supplier of drugs, his "regular person." [7]

We find a useful analogy here in the case law that has evolved under *Drew v. United States, supra. Drew* prohibits the admission of evidence of prior bad acts by the defendant unless such evidence is relevant to certain specific issues, such as motive or intent. We have held, however, that "in order to be characterized as *Drew*-type evidence, the acts portrayed must be minimally in the nature of a criminal offense." *Wheeler v. United States*, 470 A.2d 761, 769 (D.C.1983); *accord, e.g., Bigelow v. United States*, 498 A.2d 210, 212 (D.C. 1985). Conduct that is merely "strange or

suspicious," but not criminal, does not meet the *Wheeler* test. *Williams v. United States*, 549 A.2d 328, 332 (D.C.1988). Using the same analysis, we hold that cross-examination of a defense witness by a prosecutor suggesting that the witness has been intimidated into testifying falsely does not come within the *Ali* prohibition unless there is some minimal reason to suspect that the defendant was involved in the intimidation.[8] Because the prosecutor's questions here did not do that, we find no basis in *Ali* for reversal.[9]

■ This is not to say, of course, that the prosecutor's questions were entirely proper. The *Ali* case merely applies to a particular situation the general rule that a cross-examiner must have some sort of factual predicate for a potentially prejudicial question. *See, e.g., Sherer v. United States*, 470 A.2d 732, 738 (D.C.1983), *cert. denied*, 469 U.S. 931, 105 S.Ct. 325, 83 L.Ed.2d 262 (1984). The government argues that no factual predicate was needed here because the prosecutor's questions were intended to explore Mr. Dorsey's possible bias. This is too sweeping an argument. Although bias is always an appropriate subject of cross-examination, *Springer v. United States*, 388 A.2d 846, 855 (D.C.1978), the right to probe for bias on cross-examination is not absolute. *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986). "The party posing the question must proffer to the court some facts which support a genuine belief that the witness is biased in the manner asserted ... that there is a specific personal bias on the part of the witness ... and that the proposed questions are probative of bias." *Porter v. United States*, 561 A.2d 994, 996 (D.C. 1989) (citations omitted); *accord, Hayward v. United States*, 612 A.2d 224, 227 (D.C. 1992).

Thus the fact that the prosecutor's questions may have sought to establish bias

---

7. Dorsey had testified earlier that he had never before bought drugs in this neighborhood and did not know either of the two defendants. His "regular person," therefore, would have been someone other than Carter.

8. If challenged, the prosecutor should be prepared to state that reason to the court.

9. For the same reasons, we find no merit in Carter's claim of a *Drew* violation.

does not nullify the requirement that such questions must have a factual basis. On the other hand, case law in the District of Columbia is fairly lenient in describing how that requirement may be met. "Although an attorney attempting to show a witness' bias may not ask questions that are 'totally groundless' ... a question based on a 'well reasoned suspicion' rather than an 'improbable flight of fancy' is permissible." *McGrier v. United States,* 597 A.2d 36, 44–45 (D.C.1991) (citations omitted). We note also that some courts have allowed questions about intimidation of a witness to be asked without a factual predicate. *See Wycoff v. Nix,* 869 F.2d 1111, 1116 (8th Cir.), *cert. denied,* 493 U.S. 863, 110 S.Ct. 179, 107 L.Ed.2d 135 (1989); *United States v. Adams,* 759 F.2d 1099, 1111–1112 (3d Cir.), *cert. denied,* 474 U.S. 971, 106 S.Ct. 336, 88 L.Ed.2d 321 (1985); *Commonwealth v. Floyd,* 494 Pa. 537, 545–46, 431 A.2d 984, 989 (1981). Whether these and similar cases can be reconciled with *Porter* and *Hayward,* however, is by no means an easy question to answer.

■ We conclude in this case that we need not answer it. Regardless of whether the prosecutor's questions had a sufficient factual basis, we are satisfied that they did not prejudice Carter because they did not state or imply that he was in any way involved in the supposed "street talk" or in any threat to "jeopardize [Dorsey's] supply of heroin" or to inflict "other consequences." Thus, even if the questions were improper (which we do not decide), they do not require reversal.

### C. *Opinion Testimony from a Fact Witness*

■ On direct examination, Officer Nitz testified that what he had seen from his observation post "led me to believe that a narcotic transaction had occurred involving Mr. Day and Mr. Carter and Mr. Dorsey." Although Carter did not object to this testimony at trial, he now contends that Nitz's opinion as to the nature of the transaction he had witnessed should not have been heard by the jury. He claims that the trial court committed plain error in allowing Officer Nitz to say what he said [10] because it enabled him to bolster his credibility by presenting himself as an expert and expressing an opinion on the ultimate issue in the case. We find no error, plain or otherwise.

"Modern rules of evidence permit non-expert witnesses to express opinions as long as those opinions are based on the witness' own observation of events and are helpful to the jury." *Fateh v. Rich,* 481 A.2d 464, 470 (D.C.1984).[11] Whether an opinion is "helpful to the jury" and hence admissible is a question entrusted to the sound discretion of the trial court, and its admission of such testimony "will not be overturned unless it constitutes a clear abuse of discretion." *United States v. Paiva,* 892 F.2d 148, 156 (1st Cir.1989) (admission of fact witness' opinion that substance she observed in defendant's shoe looked and tasted like cocaine was within trial court's discretion). We see no abuse of discretion here. Moreover, assuming that what Nitz said went to the "ultimate issue," that fact would not make it inadmissible. *Fateh v. Rich, supra,* 481 A.2d at 470; *see also* FED.R.EVID. 704.[12]

■ Nor is there any merit in Carter's contention that Officer Nitz's opinion testimony unfairly bolstered the credibility of

---

**10.** Because Carter's challenge to Officer Nitz's testimony is made for the first time on appeal, he cannot obtain reversal on this ground unless he demonstrates plain error, *i.e.,* error "so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial." *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc).

**11.** Rule 701 of the Federal Rules of Evidence embodies this permissive approach to lay opinion testimony. It provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

**12.** FED.R.EVID. 704 provides, in relevant part, that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

his fact testimony in the minds of the jury. This case can be easily distinguished from *Beach v. United States,* 466 A.2d 862 (D.C. 1983), on which Carter bases his argument. Officer Nitz was not testifying as an expert in this case, unlike the witness who gave the testimony at issue in *Beach.* Nitz was a fact witness who had sufficient personal knowledge of the events at issue to support his opinion testimony. Moreover, the challenged testimony of Officer Nitz was essentially duplicated by that of Detective Di Domenico, who testified as an expert in drug trafficking. Thus Nitz's opinion was cumulative, and its admission cannot serve as a ground for reversal. *See Hill v. United States,* 541 A.2d 1285, 1288 (D.C.1988) (lay opinion evidence was cumulative and not prejudicial when expert later gave same opinion); *United States v. Westbrook,* 896 F.2d 330, 336 (8th Cir.1990).

Appellant's conviction is therefore *Affirmed.*