Vetera BEDNEY, a/k/a Vetera
Graves, Appellant,

v.

UNITED STATES, Appellee.

No. 93–CF–832.

District of Columbia Court of Appeals.

Argued June 13, 1995.
Decided Oct. 24, 1996.
As Amended Oct. 24, 1996.

W. Gary Kohlman, Washington, DC, for appellant. Mark J. Rochon, Washington, DC, entered an appearance for appellant.

Noel H. Gordon, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher, Thomas C. Black, and David L. Smith, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, TERRY, Associate Judge, and MACK, Senior Judge.

TERRY, Associate Judge.

Appellant was convicted of distributing Dilaudid, a controlled substance, in violation of D.C.Code § 33–541(a)(1) (1993). On appeal she contends that the trial court erred in (1) refusing to admit into evidence the prior recorded testimony of her co-defendant, who had previously pleaded guilty; (2) refusing to admit this same testimony under the hearsay exception for declarations against penal interest; (3) denying two defense requests for a continuance in order to locate the absent co-defendant; (4) permitting the government to impeach appellant with her post-arrest silence; and (5) allowing a police officer called as a lay witness to testify as an expert witness. Additionally, appellant argues (6) that the evidence was insufficient to support her conviction. We affirm.

I

Appellant was an aider and abettor in the distribution of Dilaudid. The principal was her co-defendant, Reginald Morris, who pleaded guilty a few months after the indictment was filed. When entering that plea, Mr. Morris repeatedly stated that on the date of his arrest he had been selling drugs alone, and that he had never met or worked with appellant. About five months after Morris' plea, appellant went to trial alone before a jury.

The government's evidence established that on the evening of March 19, 1992, Metropolitan Police Officer Lauren Callen was working undercover in the 1400 block of Eleventh Street, N.W. While walking along Eleventh Street, Officer Callen encountered Reginald Morris and said that she wanted to purchase a Dilaudid pill. Morris told her to "come on," and the two of them started walking together down the street. Morris then directed Officer Callen to wait near a white van. While she stood next to the van, Morris walked a short distance to the basement doorway of a nearby house. Returning after a few moments, he sold Officer Callen one Dilaudid pill, for which she paid him $40 in currency whose serial numbers had been pre-recorded. Callen then walked down Eleventh Street, and Morris returned to the basement door of the house where he had gone before. The address of this house was later determined to be 1412 Eleventh Street, N.W.

At this point Sergeant Gerald Neill, another member of the undercover team, started to walk behind Mr. Morris and followed him to the basement doorway. Neill watched as Morris went up to the door, bent down, and stuffed money through a hole where the doorknob would ordinarily have been. Looking past Morris through the hole, Sergeant Neill saw a person wearing casual clothes consisting of "a black top and a white bottom." That person "sort of move[d] down, and then [Neill] saw a hand come up to take the money" that Morris had pushed through the hole. Almost immediately, Morris straightened up and, seeing Sergeant Neill directly behind him, yelled "Police." In response, Neill ran past Morris, through the doorway,[1] and into the basement of the house. There in a "vestibule area" he found appellant, dressed in casual clothes with a

---

1. Because there was no doorknob, Neill "literally ran right through the doorway." The door flew open, and as it opened, the top hinge broke off.

black top and white slacks.[2] Another officer, at Neill's direction, arrested appellant and recovered the pre-recorded money, which was lying on the floor. Appellant had an additional $190 in her pockets. No one else was in the vestibule except for police officers.

Detective Charles Culver was called as an expert witness on the subject of drug trafficking. He testified generally about the use of "runners" and "holders" in a drug transaction. When the prosecutor asked him a series of questions about "a runner and someone inside a house," the thrust of his testimony was that the person in the house was the holder, that the person on the street was the runner, that the two of them were working together, and that the house was "a stash location" where drugs and money were kept.

Appellant was the only defense witness. She testified that she was in no way involved in the drug transaction between Morris and the undercover officer. She said that on the evening of March 19, 1992, she was in the basement apartment at 1412 Eleventh Street, N.W., caring for the elderly resident of that apartment, Velma Langford. While she was there, appellant heard a knock on the front door, but she could not answer the knock immediately because she was in the bathroom. Approximately five minutes later, as she approached the door from the living room, she saw Sergeant Neill and Reginald Morris come through the doorway.[3] Shortly thereafter, appellant was arrested and taken to the police station, and $190 was seized from her person.

In rebuttal, the government presented the testimony of Rhonda Brown, the manager of the James Apartments at 1425 N Street, N.W. Ms. Brown testified that a lease for an apartment in that building—a different building, about four blocks from the one where appellant was arrested—was signed by Velma Langford on February 3, 1992.

## II

Appellant's main contention is that the trial court abused its discretion in refusing to admit into evidence the prior recorded testimony of Reginald Morris, given during the course of his guilty plea. She argues that this testimony was admissible under the prior recorded testimony exception to the hearsay rule, and that the trial court's ruling violated her Sixth Amendment right to present evidence in her defense. We hold that the exclusion of this testimony was proper because the government did not have an adequate opportunity to cross-examine Morris during the prior proceeding in which his testimony was recorded.

### A. Factual background

When Morris pleaded guilty to the charge of drug distribution, the court placed him under oath, questioned him about the facts of the case, and sought to determine whether he qualified for the so-called "addict exception" to the mandatory minimum sentence.[4] After the court had completed its questioning, the prosecutor (the same one who later tried appellant's case) asked Morris several follow-up questions about his eligibility for the addict exception.

Morris testified that on March 19, 1992, he was selling drugs alone, that the basement stairwell where he had been hiding his stash of narcotics was not being guarded by anyone, and that he did not know appellant was on the other side of the basement door when he pushed the money through the doorknob hole. He explained that after he had sold the Dilaudid to Officer Callen, he "had a feeling" that she was a police officer, and then he saw a police car "speeding up the street." When that happened, he knew the police were coming to get him, so he stuffed the money through the hole in the door that

Appellant complained to Sergeant Neill that the door had hit her in the head.

**2.** A photograph of appellant dressed in this manner, taken on the night of her arrest, was introduced into evidence without objection.

**3.** Appellant testified that she recognized Morris only from seeing him around the neighborhood.

When he suddenly came through the door with Sergeant Neill, that was the first time she had seen Morris that day.

**4.** See D.C.Code § 33–541(c)(2) (1993). Both the mandatory minimum and the addict exception were repealed in 1995.

he had noticed earlier. "I didn't want the money on me, and I figured that they wouldn't be able to confiscate the money through the hole."

Focusing on a later statement by Morris that he had worked with others in the past when selling drugs, the prosecutor asked who those others "typically" were. Morris' counsel objected, stating that the question was "going into other crimes" about which Morris "would have a Fifth Amendment right not to incriminate himself...." Agreeing, the court instructed the prosecutor to limit his questions about Morris' drug distribution activities to March 19, 1992. Then, after the prosecutor asked a few more questions about the events of that date, the court found that Morris was an addict and set a date for sentencing.

On the second day of appellant's trial (before a different judge), defense counsel moved to introduce the exculpatory portions of Morris' testimony at the time of his guilty plea.[5] After hearing argument from both sides, the court ruled the prior testimony inadmissible on the ground that the government had not had a substantial opportunity to cross-examine Morris during the earlier proceeding. Specifically, the court found that the prosecutor's purpose in cross-examining Morris during his guilty plea was different from what his purpose would have been at trial. In addition, the court said that if Morris had been available to testify at appellant's trial, the prosecutor would have had the leeway that he did not have during the plea proceeding to explore on cross-examination any prior relationship between Morris and appellant.

## B. *The admissibility of Morris' prior testimony*

■ When seeking to admit earlier testimony under the prior recorded testimony exception to the hearsay rule, a proponent must demonstrate (1) that direct testimony from the declarant is unavailable; (2) that the declarant, when giving the prior testimony, was under oath in a legal proceeding; (3)

that the issues in the two proceedings are substantially similar; and (4) that the party against whom the testimony is now offered had an opportunity to cross-examine the declarant at the earlier proceeding. *Skyers v. United States*, 619 A.2d 931, 933–934 (D.C. 1993) (citing *Thomas v. United States*, 530 A.2d 217, 221 (D.C.1987), *modified on other grounds*, 557 A.2d 599 (D.C.1989) (en banc)); *accord, Alston v. United States*, 383 A.2d 307, 314–315 (D.C.1978). Even if these prerequisites are met, however, the trial court retains discretion to exclude the prior testimony if its probative value is outweighed by its prejudicial effect. *Feaster v. United States*, 631 A.2d 400, 405 (D.C.1993). In this case the first two elements are not in dispute. The trial court found Morris unavailable to testify at appellant's trial, and Morris' prior testimony was given after he was placed under oath. The critical issue is whether the third and fourth requirements have been fulfilled.

To establish the third prong of the prior recorded testimony exception, the proponent must show that the issues in both the prior and present proceedings are substantially similar. The issue at appellant's trial, of course, was her guilt or innocence on the charge of aiding and abetting the distribution of narcotics. But that was not at all relevant to the earlier proceeding. On that occasion the only issues before the court were whether Morris' plea was knowing and intelligent, whether it was voluntary, whether it had a factual basis, *see* Super. Ct.Crim. R. 11(c), (d), (f), and whether Morris qualified for the addict exception. Thus Morris' testimony, for the most part, dealt only with his own culpability for the crime with which he was charged and with whether he was an addict who sold drugs to support his habit.

We say "for the most part" because Morris' testimony also dealt to some extent with appellant's role in the events of March 19, 1992. Therefore, one could argue that the ultimate issue at appellant's trial was subsumed within the issues explored at the plea

---

5. After the court found Morris eligible for sentencing under the addict exception, he absconded from the drug rehabilitation center where he had been sent to await his sentencing. During

appellant's trial, the court found that Morris was unavailable and that there was no reasonable chance he would return to custody in the foreseeable future.

proceeding. Morris testified that he pushed the money through the hole in the door in an attempt to get rid of material evidence, not with the intent to give the money to appellant. He also said he did not know that appellant was on the other side of the door when he was trying to dispose of the money. Finally, Morris testified that although he had distributed drugs in the past in conjunction with others, on this particular day he was working alone.

On this record, it is a close question whether appellant's guilt or innocence was sufficiently at issue during Morris' plea hearing to satisfy the third requirement for the prior recorded testimony exception. *Cf. Feaster v. United States, supra*, 631 A.2d at 406 (during grand jury proceedings, government's questions to later-unavailable witness were "directed at the ultimate issue of appellant's guilt"); *Skyers v. United States, supra*, 619 A.2d at 934–935 (although purpose of defendant's bail hearing prior to trial was to determine whether he posed a danger to the community, the government during the hearing was permitted to cross-examine a later-unavailable witness at length about defendant's involvement in the crime for which he was later tried); *Alston v. United States, supra*, 383 A.2d at 315 (during co-defendant's guilty plea, government inquired extensively into defendant's role in the crime for which he was later tried, as well as the circumstances under which defendant and co-defendant met on the day of their arrest). We conclude, however, that we need not decide this point because the fourth prong of the prior recorded testimony exception was not established.

 The fourth prong requires a showing that the party against whom the prior testimony is now offered—in this case, the government—had an adequate opportunity to cross-examine the declarant during the earlier proceeding. *Skyers, supra*, 619 A.2d at

933–934. We have held that this requirement "is ordinarily satisfied by showing a similarity of parties and issues." *Id.* at 934 (citing *Epstein v. United States*, 359 A.2d 274, 277 (D.C.1976)).[6] In other words, once it is determined that a similarity of parties and issues exists, the final requirement of this hearsay exception is usually met if the opposing party had an adequate opportunity to cross-examine the declarant on those issues. Whether that opportunity was adequate, however, must be determined on a case-by-case basis by reviewing the record of the prior proceeding. *See Feaster, supra*, 631 A.2d at 406. Thus we look to the record of Morris' guilty plea to ascertain whether the government had an opportunity in its cross-examination to explore the issue of appellant's guilt or innocence in aiding and abetting Morris' distribution of drugs.[7]

In support of its contention that Morris' prior testimony was inadmissible at appellant's trial, the government presents two arguments. First, it maintains that it did not have the same purpose in cross-examining Morris during the earlier proceeding that it would have had during appellant's trial. At the prior hearing, the government's cross-examination was directed mainly toward Morris' eligibility for sentencing under the addict exception. But if he had been available to testify at appellant's trial, the government asserts, its cross-examination would then have had the different purpose of attacking Morris' credibility. The problem with this argument is that the government did in fact cross-examine Morris in some detail about whether appellant had aided and abetted his distribution of drugs on March 19, 1992. *Cf. Feaster v. United States, supra*, 631 A.2d at 407. Specifically, Morris testified on cross-examination that he had pushed the money through the doorknob hole

---

6. In this case the similarity of parties is not disputed.

7. The government suggests that our "similar issues" requirement for admitting prior recorded testimony is equivalent to the "similar motive" requirement of FED. R. EVID. 804(b)(1). Consequently, the government urges us to adopt explicitly the substance of the federal rule. We decline to do so, since appellant's argument regarding

Mr. Morris' testimony fails (as we shall see in a moment) under our existing case law dealing with this hearsay exception, and thus it can fare no better under the federal rule. *See also Feaster v. United States, supra*, 631 A.2d at 414 (opinion of Judge King), noting that adoption of Federal Rule 804(b)(1) would require this court en banc to overrule *Johns v. United States*, 434 A.2d 463 (D.C.1981).

into the basement where appellant was standing in an attempt to dispose of material evidence, not with an intent to give money to appellant. He also said he did not know that appellant was on the other side of the door when he shoved the money through the hole. Finally, Morris stated that although he had distributed drugs in the past in conjunction with others, on March 19 he was selling drugs alone. Thus, even if the government's purpose in cross-examining Morris was different, his actual testimony on cross-examination makes that purpose largely irrelevant.

It is the government's second argument, however, that convinces us to uphold the trial court's ruling. We assume that the government's questions about Morris' prior involvement in drug distribution activities with appellant on dates other than March 19 would have raised the same Fifth Amendment concerns at appellant's trial as they did during the prior hearing. But the court's ruling which barred this line of questioning in its entirety had the additional effect of denying the government any opportunity to cross-examine Morris about his prior *non-incriminatory* relationship with appellant.

At the prior hearing, the prosecutor asked Morris, "Well, when you weren't selling [drugs] by yourself, would you sell with somebody else?" Because an answer to this question might well have incriminated Morris, his invocation of his Fifth Amendment privilege was proper. The court, however, not only sustained his claim of privilege but also refused to allow the prosecutor to ask Morris about his activities on any date other than March 19, 1992. This further restriction, we conclude, made it impossible for the prosecutor to cross-examine Morris about his past non-incriminatory dealings with appellant, and thus it disqualified Morris' testimony from admission at appellant's trial under the prior recorded testimony exception to the hearsay rule.

In our cases in which the admission of prior recorded testimony has been allowed, the cross-examination has been generally broad and unrestricted. *See Feaster,* 631 A.2d at 406; *Skyers,* 619 A.2d at 935; *Alston,* 383 A.2d at 315. Had Morris been available at appellant's trial, he could have been asked

about any past association with appellant— how long he had known her, how close their relationship was, whether they had ever had any business dealings, and so on. So long as such questioning did not touch on prior drug sales or other illegal conduct, Morris would have had no Fifth Amendment privilege to invoke. Since appellant's defense was that she had nothing to do with Morris on the day of their arrest and knew him only as someone she had seen around the neighborhood, testimony about any prior association between the two would have been highly probative, and the government would have been entitled to explore the subject thoroughly on cross-examination and thereby try to undermine appellant's defense. Because the government was not allowed to do so at the earlier hearing, we hold that Morris' prior recorded testimony was inadmissible.

 Appellant argues in the alternative that Morris' prior testimony (along with a couple of other statements to the same effect) should have been admitted as a declaration against his penal interest. *See Laumer v. United States,* 409 A.2d 190 (D.C.1979) (en banc) (adopting test set forth in FED. R. EVID. 804(b)(3)). We disagree. The record does not reflect any "corroborating circumstances that clearly indicate the trustworthiness of the statement." *Id.* at 200. We note, in particular, that Morris' prior testimony was given almost nine months after his arrest, a lapse of time significantly longer than is generally acceptable. *See, e.g., Irby v. United States,* 585 A.2d 759, 765 (D.C.1991) (three months; statement inadmissible); *Brown v. United States,* 542 A.2d 1231, 1235 (D.C.1988) (same). More significantly, Morris' statement that appellant was not involved in the drug sale on March 19 was not against his penal interest because it did not expose him to any greater criminal liability than that to which he had already exposed himself by pleading guilty. *See Henson v. United States,* 399 A.2d 16, 20 (D.C.), *cert. denied,* 444 U.S. 848, 100 S.Ct. 96, 62 L.Ed.2d 62 (1979). We therefore find no basis for admitting Morris' prior testimony.

### III

Appellant makes several other contentions which we may treat more briefly.

## A. *The requests for a continuance*

Appellant contends that the trial court erroneously denied her two motions for a continuance of the trial so that she could try to locate her erstwhile co-defendant, Reginald Morris. She maintains that the court abused its discretion in not granting these motions because Morris was a key witness for the defense, and because there were no countervailing factors supporting the denial of her motions.

On the first day of the trial, and again on the third day, defense counsel requested a continuance in order to locate Reginald Morris, who had absconded from a drug rehabilitation center. The court denied both motions, ruling that there was no realistic chance that Morris could be found before the trial ended. In lieu of a continuance, however, the court said on each occasion that a bench warrant had been issued for Morris' arrest, and that if he were to be found, the court would do what it could to ensure his presence at trial.

A party seeking a continuance of a trial to locate a missing witness "must make a showing that such continuance is 'reasonably necessary for a just determination of the cause.'" *O'Connor v. United States,* 399 A.2d 21, 28 (D.C.1979) (citing *Brown v. United States,* 244 A.2d 487, 490 (D.C.1968)). In fulfilling this requirement, the movant must make a fivefold showing. He or she must establish (1) who the missing witness is, (2) what the witness' testimony would be, (3) the relevance and competence of that testimony, (4) that the witness could probably be obtained if the continuance were granted, and (5) that the party seeking the continuance has exercised due diligence in trying to locate the witness. *Kimes v. United States,* 569 A.2d 104, 114 (D.C.1989) (citing *O'Connor, supra,* 399 A.2d at 28). A motion for continuance is addressed to the sound discretion of the trial court, and its decision either way will not be reversed except on a showing of "clear abuse." *Adams v. United States,* 502 A.2d 1011, 1025 (D.C.1986).

We conclude that the court did not abuse its discretion in denying appellant's two mo-

tions for a continuance because there was no reasonable possibility that Morris could be found in time to testify. *See Kimes v. United States, supra,* 569 A.2d at 114–115 (affirming denial of continuance after repeated but unsuccessful efforts to locate missing witness). The record reveals that Morris had previously been subpoenaed to testify, and that when he failed to appear, the court issued a bench warrant for his arrest. Despite retaining the services of a private investigator, defense counsel was still unable to find him. On this record we agree with the trial court that there was no reasonable likelihood that Morris would become available even if a continuance were granted. We therefore find no abuse of discretion in the denial of appellant's two motions.

## B. *Appellant's alleged post-arrest silence*

Appellant contends that the trial court erred in allowing the prosecutor, during cross-examination, to impeach her with her post-arrest silence. We find no error.

At trial, during the prosecutor's cross-examination of appellant, the following occurred:

> Q. Ma'am, at the scene when the police came into your apartment, you didn't tell the police that you did not recognize Mr. Morris, did you?
>
> A. Didn't nobody ask me about Mr. Morris.
>
> Q. Ma'am, you didn't tell them that, did you?
>
> A. They didn't ask me.

Appellant now contends that these questions violated her constitutional right to remain silent.

The use of a defendant's silence after receiving *Miranda* warnings [8] to impeach her testimony at trial is a violation of due process. *Doyle v. Ohio,* 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976). However, when the accused has not been in-

---

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

formed of her right to remain silent because she has not yet been placed under arrest, there is no constitutional bar to the use of her pre-arrest silence for the purpose of impeachment. *Brecht v. Abrahamson*, 507 U.S. 619, 627–628, 113 S.Ct. 1710, 1716, 123 L.Ed.2d 353 (1993); *Jenkins v. Anderson*, 447 U.S. 231, 239, 100 S.Ct. 2124, 2129–2130, 65 L.Ed.2d 86 (1980).

■ In this case, we hold, the court did not err in allowing the prosecutor to cross-examine appellant about her silence. The record makes clear that what appellant now regards as her post-arrest silence was actually pre-arrest. Sergeant Neill's testimony shows that appellant was not placed under arrest when he and Morris entered the basement apartment. Since the prosecutor's question concerned the moment "when the police came into [the] apartment," there was no *Doyle* violation, for appellant at that point had not yet been arrested. It was not until after Morris had been arrested that Sergeant Neill directed another officer to take appellant also into custody. Moreover, appellant's silence was not a response to any custodial interrogation. The evidence shows that the police, when in the Eleventh Street house, did not ask her about her connection with Morris, and that she similarly did not volunteer any information. Thus "no governmental action induced [appellant] to remain silent before arrest," *Jenkins v. Anderson, supra,* 447 U.S. at 240, 100 S.Ct. at 2130, and there was no constitutional violation in the prosecutor's question.

### C. *The alleged "expert" testimony of Sergeant Neill*

■ At trial, the prosecutor asked the following questions during his direct examination of Sergeant Neill:

Q. Okay. What did you do when you got to the apartment?

A. I saw the runner walking up towards the—in the yard towards the basement location, and I got out of the car and followed him.

\* \* \* \* \* \*

Q. Sergeant, had the individual who was involved in the sale to Officer Callen been described to you as a runner?

A. Yes, sir.

Appellant now contends that these references to Morris as a "runner" cloaked Neill with the enhanced credibility accorded to expert witnesses, and that this was improper because Neill was testifying only as a fact witness. We are satisfied, however, that Sergeant Neill's testimony was of a non-expert nature and was based entirely on his own observations.

■ A non-expert witness may express opinions when testifying, so long as they are based on the witness' personal observation of events and are helpful to the jury in fulfilling its role as fact-finder. *Carter v. United States*, 614 A.2d 913, 919 (D.C. 1992); *Fateh v. Rich*, 481 A.2d 464, 470 (D.C.1984). Whether a witness' lay opinion is helpful to the jury is a decision left to the sound discretion of the trial court. *Carter,* 614 A.2d at 919; *see also Hill v. United States,* 541 A.2d 1285, 1288 (D.C.1988) (when police officer's opinion testimony is based on personal knowledge, officer is not deemed an "expert").

■ In the present case, Sergeant Neill's statements about Morris' role as a runner were not made in the form of an opinion at all. The record makes clear that Morris was described to Neill over the police radio as a "runner" for purposes of identification. In context, Neill's reference to Morris as a runner was simply part of his narrative of his own role in the events that led to Morris' arrest. In any event, even if Neill's use of the word "runner" amounted to an opinion, the expert testimony of Detective Culver later in the trial made it cumulative and thus non-prejudicial. *See Hill v. United States, supra,* 541 A.2d at 1288.

### D. *Sufficiency of the evidence*

■ Finally, appellant contends that the trial court erroneously denied her motion for judgment of acquittal because there was no evidence connecting her to the actual sale of Dilaudid. She argues that since the only evidence tying her to Morris' drug distribu-

tion activities was her presence in the basement when he shoved the money through the hole in the door, the case should not have gone to the jury. We disagree.

To convict someone as an aider and abettor, the government must prove that the defendant associated herself with a criminal venture, participated in that venture as something she wished to bring about, and sought by her actions to make the venture succeed. *E.g., Settles v. United States,* 522 A.2d 348, 357 (D.C.1987). The government's evidence passed this test. The testimony of Officer Callen and two other officers (who were watching from a parked car) established that Callen purchased one Dilaudid pill from Reginald Morris. Sergeant Neill testified that he saw Morris push the proceeds of that sale through the doorknob hole in a basement door toward someone on the other side of the door, whose "hand [came] up to take the money." There can be no dispute that appellant was the person on the other side of the door, even though she denied retrieving the money. Neill also said that appellant was arrested in a house known as a place where illegal drugs were regularly sold. Finally, the expert testimony of Detective Culver, in response to a hypothetical question, allowed the jury to infer that she and Morris were jointly involved in the drug sale and that each of them had a defined role. Viewed as it must be in the light most favorable to the government,[9] this evidence was sufficient to support appellant's conviction. *Stevenson v. United States,* 608 A.2d 732, 733 (D.C.1992). "The government need not establish that appellant [distributed] the drugs herself ... in order to prove that she aided and abetted someone else in doing so." *Greer v. United States,* 600 A.2d 1086, 1088 (D.C.1991) (citation omitted); *see also Griggs v. United States,* 611 A.2d 526, 528 (D.C. 1992) (person who introduces buyer to seller, stands nearby while sale takes place, and "solicit[s] payment from [buyer] for his assistance" is an aider and abettor of the sale); *Mason v. United States,* 256 A.2d 565, 566–567 (D.C.1969) (person who provides drugs to actual seller is an aider and abettor of the sale).

## IV

For the foregoing reasons, appellant's conviction is *Affirmed.*

MACK, Senior Judge, dissenting:

I part company with my colleagues when they reason that the prior recorded testimony of Reginald Morris, given under oath, was inadmissible because the government, at the time of the recording, was prevented from cross-examining the witness about activities other than on the date of March 19, 1992. The issue at appellant's trial was precisely that of her guilt or innocence of drug distribution on March 19, 1992, and as counsel for appellant argues, "the probative value of the [recorded] statement [exonerating her] could not have been greater." *See Alston v. United States,* 383 A.2d 307 (D.C.1978). Prejudice to the government, if any, was minimal, as well as speculative.[1]

In my view, the appellant met all the requisites necessary for invocation of the recorded testimony exception to the hearsay rule. *See Feaster v. United States,* 631 A.2d 400, 405 (D.C.1993).

I would reverse and remand for a new trial.

---

9. *E.g., Nelson v. United States,* 601 A.2d 582, 593 (D.C.1991) (citing cases).

1. Any evidence of past non-incriminatory association between the witness and the defendant might or might not have undermined the defense.